The plaintiff had a verdict for $24.00.

---

CIRCUIT COURT FOR MULTNOMAH COUNTY, NOVEMBER TERM, 1869.

## B.. S. BOYDSTON v. J. S. GILTNER.

PLEADING.—The complaint-contained the following statement: "The fracture was a simple fracture, and one that could easily have been reduced and caused to heal and become strong by a surgeon of ordinary skill, by ordinary diligence and care," and the statement is not denied by the answer." *Held*, that it is admitted that the fracture is a simple fracture, but the statement that the injury could have been cured, etc., is a conclusion, and is not to be deemed admitted.

EXPERT.—OPINION.—A medical expert was not permitted to give his opinion in regard to the skill of the defendant, but was allowed to state how [with what degree of skill] the defendant performed a certain surgical operation.   *Williams* v. *Poppleton*, referred to.

SURGEON, DISCRETION OF.—If a surgeon purposely refracture a broken arm without informing the patient of the nature of the operation, it does not follow from that fact alone that he was guilty of bad surgery.

GROSS IGNORANCE.—But if the arm was refractured by the defendant because of gross ignorance or the want of ordinary care or skill, that act of itself renders the defendant liable.

COMPROMISE VERDICT.—Jurors not to compromise in this class of cases contrary to the individual juror's convictions of the truth.

THE complaint alleges that the bones of plaintiff's right arm were broken about midway between the wrist and the elbow.   That the fracture was "a simple fracture, and one which could easily have been reduced and caused to heal and become strong, by a surgeon of ordinary skill, by ordinary diligence and care."   That the defendant, as a physician and surgeon, undertook the case for hire, and that the plaintiff strictly followed the directions of the defendant.   That the defendant, "by reason of gross ignorance,

carelessness and inattention to his duties as surgeon, entirely failed to treat said limb with ordinary surgical skill," and by reason of said failure, said fracture was not reduced and said bones have failed to unite, "and said fore-arm is crooked and deformed, and plaintiff has lost the use of said arm."

The complaint sets out loss of time and expenses incurred; and claims $10,000 damages.

The answer denies want of care, skill and diligence; denies ignorance; denies that plaintiff followed defendant's directions; alleges that the injury was treated with care, skill and diligence; alleges that the fracture was properly reduced and treated, and that the bones of the arm became firmly and properly united, and that in that condition the plaintiff was discharged from defendant's care, and that "the plaintiff did not in divers ways and at divers times follow the directions of the defendant."

The replication denies the new matter alleged in the answer.

*Logan, Shattuck & Killin,* for the plaintiff.

*Caples & Moreland,* for the defendant.

The case coming on for trial, a jury was impanneled, and on motion of the defendant, all witnesses, except medical experts, were directed not to be present at the examination of other witnesses.

The plaintiff, *B. S. Boydston,* sworn:

"My arm was broken about the middle of August, 1868. At the first the defendant applied a splint. * * * The second or third day he dressed it again in a similar manner. A little more than three weeks after the injury, defendant took the splint off at his office, examined the arm particularly, and said, 'It has commenced to heal.' He then did it up in a hurry and went away, saying he would be back in half an hour. He came back in half an hour and took the bandage off; the arm lying along on the table, and the hand fell over on to the palm. I said to him, 'You said it had united.' He replied, 'It was just stuck.' I

was under defendant's care in all about three months. At the end of that time the arm was in the condition it is now." (The arm was exhibited to the jury; its present condition was thus described by a medical expert):

" The injury was an oblique fracture of both bones of the right forearm (*ulna and radius*) just below the middle. The fragments have united in a deformed or crooked condition. That is, the superior or upper end of the inferior or lower fragment of the *ulna* projects backwards and slightly upwards—in other words, *overrides* the upper fragment of the same bone (the *ulna*). The superior or upper end of the lower fragment of the *radius* projects a little forwards, or in technical language *anteriorily*. The right hand is considerably turned inwards—or *pronated*. The forearm presents a distorted and twisted appearance, with somewhat of a lump or projection on the back of the seat of fracture.

" The union is probably *osseous* or bony. The arm is almost as strong—though not as useful as prior to the injury. The injured fore-arm appears about three fourths of an inch shorter than the other, and is flexed or bent forward or inward at the point of fracture; the direction of the arm from that point to the wrist being about eight degrees from the natural position."

The plaintiff testified further: " I followed the defendant's directions as to the treatment. When defendant discharged me he took the splints off, helped me to put my coat on, and said 'It is all right.' About three weeks after that he looked at it; he said 'It is crooked.' I told him it was just so when he discharged me. He told me to come to his office. By his advice a tin straightener or splint was made and applied, in order to render the arm more straight."

*Dr. Watkins*, testified: " Last spring I saw the arm. The *radius* was slipped-by a little more at its fracutured ends than the *ulna*. I think the *ulna* was united, and that the *radius* had not a bony union. The arm was somewhat bent. Ordinarily the bones will unite in six or eight weeks. There is a union of the *radius*, the union is *cartilaginous*. If bony union had taken place, and the bone became solid, a steady train would not displace it (so as to cause an angle).

If the fracture is very oblique it will be more difficult to keep the bones in place."

*Dr. Chapman* testified: "I saw the plaintiff's arm nearly a year ago; it was crooked. He was at work, but had not a good use of it. My mode of treating such a fracture, after reduction, is to dress it in splints, putting a roller bandage on first, then splints on the inner and outside of the arm, and bandage outside or over the splints."

*Dr. Wythe,* deposed: "I saw the arm about —— months after the injury. I advised that it be broken over again."

Burch, Starr, and Hay, each testified that the arm was about in its present condition, when the plaintiff was discharged from treatment.

The defendant, *Dr. J. S. Giltner.*—Testified in his own behalf. "I am a physician and surgeon. I was graduated in 1836, at the medical college of Pennsylvania. When called to treat the plaintiff, I reduced the fracture, and applied a roller bandage, commenced bandaging at the fingers, and carried it up towards the elbow, then applied splints on the inner and outer side of the fore-arm. I applied a compress (made by wrapping a small stick with cloth) on the inner and outer side of the arm, under the splints, to press between the *ulna* and *radius*. When the splints were wrapped, I placed the arm in a sling, with the hand in a position between *supination* and *pronation*. On the morning of the eighth of September, plaintiff came to the office, and the bandages were loose. I examined the arm; the fractured parts were in proper position, and were as when the fracture was first reduced. I saw him on each alternate day after that. On the twelfth and fourteenth of September, I told the plaintiff I wanted he should procure another surgeon, to act in consultation with me; that I was not disposed to take the risk of a prosecution. He said that if I did the best I could, I should not be responsible for the result. I took off the wooden splints on the thirty-first of October. The arm was then straight, and in proper shape. I then dressed it again, using pasteboard splints. I then discharged the plaintiff, telling him to wear the pasteboard splints six weeks. Before the wooden splints were taken

off, plaintiff told me he had removed the bandages, because they were painful. He went to work in a tin shop without my knowledge. Dr. Wythe being consulted, advised with me, the support made of tin. The *ulna* and *radius* were both fractured, the latter obliquely. If the bones had been grown together, they could have come to their present position without a refracture. But not so, if they had been joined by a bony union. I follow Gross' system."

*Dr. Chapman*, called by defendant, testified: "There are cases where, although the bones are in proper position, a bony or *osseous* deposit will not take place. The first union is *cartilaginous;* after a long time generally, the *cartilaginous* deposits will gradually assume an *osseous* character, and may in time become bone."

This statement was objected to, and the plaintiff moved to strike it out, on the ground that the plaintiff alleges, (which the answer does not deny), that the fracture was simple, and the injury one that could have been easily cured: *Held*, that the allegation that the fracture was a "simple fracture," must be deemed admitted, but the statement that the injury could have been cured by ordinary care and surgical skill, is the statement of a conclusion, and cannot be treated as a fact, admitted by the pleadings. The motion was overruled.

*Dr. Bodman*, testified: "Absorption may take place after the fractured bone has united. It may be caused by too much exercise, by physical debility, or other and perhaps complicated causes."

*Dr. Loryea*, testified: "A proper degree of excitement in the system favors the secretion and deposit about the place of fracture, of plastic *osseous* matter, that afterwards takes the consistency and form of bone. But if the system becomes too much excited, amounting to inflammation, the deposit will be suspended. If the excitement ceases and the system becomes torpid, that will also suspend such secretions. My opinion is, that the *ulna* is in a state of *osseous* union, and the *radius* in a state of *cartilaginous* union, and that it is probably the union of the two bones with each other that now prevents the ordinary and natural mo-

tion of the wrist. What union there is, is very nearly a bony union. When the *nutricious* artery is injured, ossification will be tardy."

*Rev. Mr. Myers*, sworn: Corroborated the statement of Dr. Giltner as to the mode of dressing the arm in the first instance. And testified that both arms appeared of the same length at the time defendant was discharged from treatment.

*F. M. Grey*, testified: "On one occasion, when the defendant was dressing the plaintiff's arm, the plaintiff said he had dreamed and hurt his arm in the night. And that the bandages had become loose. About the time the defendant was discharged the arm was straight and of the same length as the other. When the defendant looked at it some weeks after that, a lump was on it, and the plaintiff then said 'it was straight when the splints were taken off,' and that the lump 'had come since.' "

*Dr. R. Glisan*, testified: "I have been acquainted with the defendant and his practice four or five years. I once saw him amputate a fore-arm."

Question.—"Have you known enough of his practice to be able to judge in regard to his skill as a surgeon, and if yes, what is your opinion on that subject?"

The question was objected to as incompetent and the objection sustained.

Question.—"How did he perform the surgical operation you have witnessed?"

The same objection was made, but was overruled, and the witness answered:

"He performed the operations skillfully." Witness continued—"If this fracture was properly reduced, and if a bony union then took place, the parts might acquire their present position by a re-fracture, or possibly by re-absorption of the *osseous* deposit. Cases of such absorption are rare."

*Cross-examined.*—After a firm cartilaginous union, it would not be likely to get into this position, but if the union was slight, such a thing would not be very uncommon or very improbable.

Question.—"If the arm had not been reduced or dressed with splints, what would have been its present condition?"

Answer.—"The same as it is now."

*Mr. Crouch,* testified: "About the tenth of January, I heard plaintiff say his arm was getting along pretty well, and that he took the splints off because they hurt him while turning the crank at the tin-shop."

*John Kersher,* testified: "In March I heard the plaintiff say he took the splints off because they hurt him when he was at work."

*Parrish Giltner,* testified: "When the defendant took the wood splints off, he, told the plaintiff he ought not to work for some time. My father (the defendant) measured both arms at that time; they were of the same length."

The evidence also showed that the plaintiff, about the time or soon after the wood splints were permanently removed, commenced to exercise the arm by turning a light crank of a machine used for rimming or edging small tin-can heads.

The plaintiff testified that the exercise was in pursuance of defendant's advice and direction. The defendant testified the contrary. The plaintiff testified that he wore the pasteboard splints after his discharge, and while exercising, for some weeks, and that he wore them until they were literally worn into fragments. Several medical experts were examined as to the probability of the present condition of the arm being produced without a perceptible and painful refracture, if *osseous* or *cartilaginous* union had once taken place, while the fractured parts were in apposition. But no very decided opinions were elicited on that point.

UPTON, J., in charging the jury, after stating the issues made by the pleadings, explained the duties and liabilities of physicians and surgeons, substantially as in the case of *Heath* v. *Glisan et al,* the judge proceeded to say: "If you should find that Dr. Giltner, the defendant, refractured the arm, it does not follow from that fact alone that he was guilty of bad surgery. Nor does it follow from the fact that the plaintiff was not informed what the surgeon was doing or about to do. If you find from the evidence that the arm was purposely refractured by the defendant under circumstances that disclose a want of ordinary care and skill on his

part—or that he refractured it improperly, either because of gross ignorance or the want of ordinary care or skill on his part, that act of itself renders the defendant liable. But unless you do find from the evidence both that the defendant refractured the arm, and that it was the result of a lack of ordinary skill or care, there is no blame to be attributed in consequence of that act, and your inquiries should be directed to other branches of the case.

Counsel both for the plaintiff and for the defendant have remarked upon the propriety or impropriety of what they term a compromise verdict. In regard to that, it is my duty to say to you, that jurors should carefully and patiently canvass and examine all the evidence, with an honest and conscientious effort to reconcile any differences of opinion they may entertain of the truth of the matters put in issue. And it is sometimes the case, when only dollars and cents are involved, when it is probable the exact truth can never be known, and where there is an honest difference of opinion among jurors, as, for an instance, when the matter between the parties is the state of their accounts, which have been loosely kept, and there is doubt as to the true balance, that concessions may be made for the benefit of both parties, which are not fully in accord with the individual juror's view of the facts proved. But in this class of cases, each party has a right to insist that the jury, and each juror, should render a verdict, if at all, literally "according to the law and the evidence, as given on the trial."

When a man enters upon a trade or profession for his life's business, he stakes the efforts of a lifetime in building up for himself a character and a name in that trade or profession; and if the plaintiff's case is not established by the proofs, the defendant is entitled to a verdict at your hands, which you have no right to withhold from him. But if the defendant assumed to act in a profession of which he is grossly ignorant, or if, after undertaking the grave responsibility of treating the plaintiff's broken limb, he has failed to treat the case with that ordinary care and skill that every one has a right to expect of his physician and surgeon, and has thus deprived the plaintiff, for the remainder of his life,

of the proper use of his right hand, your verdict should compensate the plaintiff for the injury he has sustained, and place a mark on the defendant's professional standing that time will not efface.

The jury rendered a verdict for the defendant.